Filed 7/29/21  In re Paul H. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re PAUL H., a Person Coming Under the Juvenile Court Law. | B308176 (Los Angeles County Super. Ct. No. 20CCJP02205A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CRAIG H.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Victor G. Viramontes, Judge.  Affirmed in part, reversed in part.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

_____

Craig H. (Father) appeals from the jurisdiction findings and disposition order declaring three-year-old Paul H. a dependent of the juvenile court and removing him from Father's physical custody. The juvenile court sustained a petition under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j),[1] alleging Father made an inappropriate plan by leaving Paul in the care of LaJulia B. (Mother) in violation of a prior court order, and Mother physically abused Paul's half-sister Lacazia H. and failed to protect her from physical abuse by maternal relatives. We affirm the jurisdiction findings but reverse the order removing Paul from Father's custody and remand for further findings as to whether there are reasonable means to protect Paul short of removal from Father.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prior Dependency Cases*

Mother has two children from a prior relationship, Lacazia H. and Malachi H. In 2014 the juvenile court sustained allegations Mother physically abused Lacazia by inflicting bruises on Lacazia's face and arm. In addition, the court found

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

Mother had a history of substance abuse and used drugs during her pregnancy with Malachi.  Further, Mother and Malachi tested positive for opiates at Malachi's birth in 2010.

In July 2016, during the pendency of the dependency proceeding involving Lacazia and Malachi, the Los Angeles County Department of Children and Family Services (Department) received a referral that Mother and her newborn baby Paul tested positive for opiates and benzodiazepines at Paul's birth.  In September 2016 the juvenile court sustained allegations as to Paul under section 300, subdivisions (a), (b)(1), and (j), concerning Mother's substance abuse and physical abuse of Lacazia; Mother's use of prescription drugs during her pregnancy with Paul; and that Mother and Paul tested positive for opiates and benzodiazepines at his birth.  The court also sustained allegations concerning Father's failure to protect Paul from Mother's substance abuse.

Mother failed to enroll in counseling or mental health services, failed to attend her substance abuse program, and tested positive for drugs, including a positive test for cocaine and hydrocodone on April 28, 2017.[2]  On September 27, 2017 the juvenile court entered a final juvenile custody order granting Father sole legal and physical custody of Paul and terminated jurisdiction over Paul.  Mother was granted monitored visits for "at least three (3) times per weeks for at least three (3) hours per visit," with Father to select the monitor.  The court continued to exercise jurisdiction over Lacazia and Malachi.

---

[2]    The record does not reflect the juvenile court's orders at the disposition hearing.

On April 23, 2019 the Department received a referral alleging Mother was slurring her words and seemed intoxicated while caring for Paul. The reporting party had been in a telephone conversation with Mother when the caller could hear a child in the background, who the Mother stated was Paul. The caller told Mother she was not supposed to be alone with Paul, to which Mother responded that Father was present.

On July 11, 2019 then-16-year-old Lacazia ran away from her placement. A social worker called Mother multiple times between August and December to ask about Lacazia's whereabouts. Mother reported she had not seen Lacazia. On November 13, 2019 a sheriff's deputy visited Mother's home to inquire about Lacazia's whereabouts. Father came to the door and stated the family had not seen Lacazia in a very long time.

B. *The Investigation and Dependency Petition*

On April 11, 2020 the Department received a referral alleging Mother, maternal grandmother Gwendolyn B., and maternal aunt Lacreicia B. had physically abused Lacazia, and Father neglected then-three-year-old Paul. Sheriff's deputies found Lacazia in Mother's home after neighbors reported hearing a scream. Lacazia told one of the deputies that she had been staying with Mother, Gwendolyn, and Lacreicia since she ran away from her placement in July 2019, and Paul was also living with Mother and the relatives.

Lacazia told the deputy that on April 1, 2020 she and Mother got into an argument, and Mother pushed her to the ground. Mother got on top of her and punched her arms and body. Mother also stabbed Lacazia with a key on the inside bend

4

of Lacazia's right elbow, leaving an approximately one-inch wound.

Lacazia also told the deputy about an April 7 argument she had with Lacreicia over Lacazia's broken cell phone. Lacreicia pushed Lacazia, and Lacazia fell backward onto to the couch. Gwendolyn held Lacazia down on the couch while Lacreicia punched her body, arms, and head. Mother stopped the attack by pulling Lacreicia off Lacazia. The next day Lacazia got into an argument with Mother after Mother said Lacazia would not be getting a new cell phone. During the argument, Mother slapped Lacazia, and Lacazia pushed Mother. Gwendolyn saw Lacazia angrily throw items from a small refrigerator. She told Lacazia, "You're not gonna do this in my house." Gwendolyn grabbed Lacazia's hair from behind and pulled her head down; she also dug her nails into Lacazia's right forearm, leaving small scratches. Mother then pushed Lacazia to the ground and punched her all over her body. Gwendolyn continued to hold Lacazia's hair while also punching her. The deputy observed Lacazia had several bruises and cuts on both of her arms, bruises on her upper leg area, a large bruise on her left thigh, and a wound on her right elbow that was almost healed.

In her subsequent interview with the dependency investigator, Lacazia disclosed that Mother had picked her up from her placement and took her to Gwendolyn's house in July 2019. Lacazia left without informing anyone from her placement. Lacazia wanted to return to her placement in August 2019 to attend school, but no one would take her there. She had been out of school since. Lacazia confirmed Mother, Gwendolyn, and Lacreicia physically abused her on multiple occasions. Lacazia was uncomfortable, started to cry, and was "very closed off" when

5

disclosing the abuse. Lacazia asked, "[I]s what I am telling you going to get my aunt and mom in trouble?" Lacazia said she did "not want them to pay for what they did" because Mother was still her mom.[3] Lacazia indicated she was accustomed to the abuse and it happened often. The social worker observed a circular bruise on Lacazia's left arm above her elbow, cuts and scratches on both her arms, and a wound from a deep cut on her right arm above her inner elbow. Lacazia denied Mother or Father lived in Gwendolyn's house. Lacazia stated Father only brought Paul to Gwendolyn's house when he needed Gwendolyn to take care of him. Lacazia also denied Paul was ever alone with Mother.

On April 11 and 15 a social worker spoke with Father by telephone. Father stated he went to Kentucky to care for a sick family member, so he left Paul in the care of Gwendolyn and Mother. Father was staying with the paternal grandmother in Kentucky. Father left Paul with Gwendolyn because he did not have enough money for airfare to bring Paul to Kentucky. He planned to find a job in a hospital in Kentucky,[4] then return to

---

[3] No charges were filed arising from the physical abuse because Lacazia declined to cooperate with the investigation.

[4] Father had been an emergency room nurse for 16 years and a traveling nurse from 2007 to 2012. Father lost his nursing license in 2012 after he and Mother were arrested for stealing items for Lacazia's birthday from a store. Father was currently unemployed and was awaiting reinstatement of his nursing license to obtain a nursing job in Kentucky. Mother had been employed as nurse by a medical facility until she was fired in 2012 for selling medication.

Los Angeles to bring Paul to Kentucky. Father knew Mother lived in Gwendolyn's home. But he never suspected Mother used drugs, and he had never witnessed any physical abuse of the children by Mother, Gwendolyn, or Lacreicia. Father had no concerns about Mother's ability to care for Paul, and he trusted her. He asserted there were no "red flags" or other concerns about Mother and Gwendolyn taking care of Paul.

Father admitted he lived with Mother in August 2019 and stayed with her until he left for Kentucky in October 2019.[5] Father denied Lacazia was in the home during that period.

C.    *The Dependency Petition and Detention*

On April 17, 2020 the Department filed a petition on behalf of Paul alleging under section 300, subdivisions (a), (b)(1), and (j), that Mother physically abused half-sibling Lacazia; Lacazia and Malachi were current dependents of the court and receiving permanent placement services; Gwendolyn and Lacreicia physically abused Lacazia; and Mother's physical abuse of Lacazia and failure to protect Lacazia from Gwendolyn's and Lacreicia's abuse placed Paul at risk of serious physical harm. The petition also alleged under section 300, subdivision (b)(1), that Father placed Paul "in a detrimental and endangering home environment and made an inappropriate plan for the child's ongoing care and supervision, in that [Father] left the child in the

_____

[5]    We note Father's statement he left Gwendolyn's house in October 2019 is inconsistent with Father answering the door at the house in November 2019, but this fact is not significant for our review.

7

care of [Mother], who has [j]uvenile [c]ourt ordered monitored visits with the child."

At the April 22, 2020 detention hearing, Father requested Paul be released to him. Father argued he had full custody of Paul and thought he could serve as a monitor for Mother's visits. Father acknowledged Mother resided with Gwendolyn, but he believed he had made an appropriate plan for Paul to stay temporarily with Gwendolyn because "he had no indication of any substance abuse" by Mother or physical abuse by Gwendolyn.

The juvenile court denied Father's request, stating, "Remaining in the home of parents is contrary to the minor's welfare, given issues in this case regarding substance abuse and appropriate physical discipline, Father's failure to make an appropriate plan despite the fact that he knew of Mother's substance abuse and physical abuse issues, and he had full legal custody and failed to comply with court orders." The court granted Mother and Father monitored visits for a minimum of three times per week for three hours each visit.

D. *The Jurisdiction and Disposition Report*

The dependency investigator interviewed Father by telephone on May 22, 2020. Father was still living in Kentucky and wanted to raise Paul there. Father stated he left Paul in the care of Gwendolyn, not Mother, although he was aware Mother lived in Gwendolyn's home. Father reiterated that he had no safety concerns for Paul while in Mother's care and no knowledge of Mother's addiction to prescription drugs. Father stated he believed he could leave Paul with whomever he wanted because he was granted sole custody in 2017, and he did not recall the juvenile court ordering Mother's visits to be monitored. He also

8

thought Mother had completed all her services in 2017, and he did not understand why Mother was unable to reunify with Paul at that time. Father considered Mother to be his wife because they had been in a relationship for eight years.

In her July 13 and 14, 2020 interviews, Mother stated she considered Father to be her common law husband because they had "been together long enough." Mother asserted that if Paul were released to Father, Mother would not be a safety threat because she planned to stay in California while Father would raise Paul in Kentucky. But she also told the dependency investigator, "[M]ake sure you put this in your report[.] I will get my boys [Paul and half-sibling Malachi] back. . . . [T]hey are coming home."

Mother denied she had an addiction to prescription drugs or that she physically abused Lacazia. Mother did not know how Lacazia received her injuries. Mother stated Lacazia had been "coming and going" from the family home when she ran away from her placement, and Mother claimed she had informed Lacazia's social worker of Lacazia's whereabouts. Lacazia used derogatory language and threatened Mother and Gwendolyn because Mother and Father would not buy her an expensive cell phone. Mother left the home with Paul after Lacazia started "tearing the house up" by punching holes in the walls and causing a chandelier to fall by hitting it with a broom. When Mother and Paul returned, Mother saw Lacazia kick Gwendolyn out of bed, causing Gwendolyn to fall and her urinal seat to spill on her. Mother asserted Lacazia lied about the physical abuse to get Mother arrested.

Stephanie H., Father's adult daughter from a prior marriage, contacted the Department on June 19, 2020 after she

9

learned Paul was in foster care. Stephanie was concerned about Paul's safety if he were released to Father's care because of Father's ongoing relationship with Mother. Stephanie was willing to be Paul's caregiver and to provide him with permanency.

Paul's caregiver reported Paul would hit himself in the head, call himself stupid if he made a mistake, and display aggression toward one of his foster brothers. The caregiver had to warn Paul's school of his violent and aggressive behavior towards himself and others. Two days after Paul started school, Father requested Paul be taken out of school because of the COVID-19 pandemic. The Department requested Paul's caregiver be granted coeducational rights to ensure Paul's needs were met in a timely fashion.

E. *The Jurisdiction Hearing*

At the July 29, 2020 jurisdiction hearing, the juvenile court sustained the allegations under section 300, subdivision (j), that Mother, Gwendolyn, and Lacreicia physically abused Lacazia, and Mother's failure to protect Lacazia from abuse by the maternal relatives endangered Paul's health, safety, and well-being.[6] The court stated, "Based on the evidence in the record as well as the court's previous findings, I'm finding the Department has carried its burden on the j-1 and j-2 allegations as I'm placing weight on the statements of Lacazia as well as on the physical injuries on the record." The court also sustained the allegations under section 300, subdivision (b)(1), that Father placed Paul "in

---

[6] The court dismissed the similar allegations under section 300, subdivisions (a) and (b).

10

a detrimental and endangering home environment and made an inappropriate plan for the child's ongoing care and supervision" by leaving Paul in the care of Mother, who had only court-ordered monitored visits with Paul.

The court ordered "the Department to make best efforts" to have Father's home in Kentucky assessed. The court explained, "I'm ordering the Department to communicate with the appropriate child protective services in Kentucky and do so in advance of the next hearing so that there's an opportunity for the Father's home to be assessed. Whether that happens or not is beyond the Department's control, but the Department can make that call before the next hearing." The court ordered the Department to prepare a last minute report that would include a walk-through assessment of Father's home.

F.    *Last Minute Information for the Court and Disposition Hearing*

The September 10, 2020 last minute information for the court stated the child protective agency in Kentucky performed out-of-state courtesy home assessments only by video conferencing. The Kentucky social worker wrote in an email, "I would feel more comfortable if you could do this yourself since we have no knowledge of the case, nor is there any plan to place a child in the home."

The September 22 last minute information for the court stated the dependency investigator had completed a virtual home assessment of Father's home that day. Father's home in Kentucky appeared clean and free of excessive clutter; the utilities were in service; and Father's bedroom was free of any visible safety hazards. But the dependency investigator was

11

unable to assess the bedrooms occupied by paternal grandmother and paternal uncle because the doors were locked.  Father stated he would discuss the matter with paternal grandmother and uncle and schedule a time in which the dependency investigator could assess the bedrooms.  Father said he did not own any weapons or pets, except there were a few cats that roamed the five-acre property.  Father reported the home did not contain any smoke detectors, but he would purchase them and send photographs to the dependency investigator once they were installed.

At the September 23, 2020 disposition hearing, the juvenile court declared Paul a dependent of the court and removed him from Mother's and Father's custody.  The court stated, "The court finds that continuance in the home of the parents is contrary to the child's welfare.  The court finds by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if the child were returned home and there are no reasonable means by which the child's physical health can be protected without removing the child from the parents' physical custody.  I reach this determination based on the facts found true in the sustained petitions as I am finding these ongoing risks compel the court to remove here today as the mother has not addressed the physical abuse concerns sufficiently to ameliorate risk and allow return home.  And the father placed the child in the custody of the mother when he knew of the previous physical abuse allegations and I haven't seen any evidence that he has been able to ameliorate that risk for today and moving forward."

The court added, "So as a result, the agency has complied with the case plan by making reasonable efforts to return the

12

child home or taken whatever steps are necessary to finalize a permanent plan.  The court[] finds the Department has made reasonable efforts to prevent or ameliorate the need for removal and no services are available to prevent removal and the court orders that the children are removed from both parents."

The juvenile court ordered assessments of Father and Stephanie H. (who lived in Wisconsin) through the Interstate Compact on the Placement of Children.  In addition, the court ordered Father and Mother to attend individual counseling to address cases issues with a licensed therapist, and Mother to attend a parenting course.  The court granted Father and Mother monitored visits with the Department having discretion to liberalize visitation.

The juvenile court asked whether Mother or Father objected to the request by minor's counsel that Paul's caregiver be a coeducational rights holder.  Father's attorney responded, "No objection to coeducation."  The court then appointed Paul's caregiver "as the coeducational rights holder" for Paul.

Father timely appealed.

## DISCUSSION

A.    *Substantial Evidence Supports the Jurisdiction Findings*
      1.      *Governing law and standard of review[7]*
"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has

---

[7]     Father contends there was not substantial evidence to support the detention order because the Department could have provided reasonable services to prevent removal by paying for

13

suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re E.E.* (2020) 49 Cal.App.5th 195, 205.) Section 300, subdivision (b)(1), requires the Department to demonstrate three elements by a preponderance of the evidence: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child, (2) causation, and (3) serious physical harm or illness or a substantial risk of such harm or illness. (*E.E.*, at p. 205; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child presently needs the court's protection." (*In re Christopher R.* (2014) 225 Cal.App.4th

---

Paul's airfare to transport him to Father's home in Kentucky. A detention order "is a temporary order that lasts only until the placement decision is made in a disposition order." (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1414.) Father's challenge to the detention order is rendered moot by the disposition order. (*In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498 (["intervening event renders moot the issues concerning the validity of the detention order"]; *Sabrina H.*, at p. 1414 [disposition order rendered detention order moot].)

14

1210, 1215-1216; accord, *In re J.M.* (2019) 40 Cal.App.5th 913, 921.)

'"In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633; *In re D.B.* (2018) 26 Cal.App.5th 320, 328.) "Substantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E., supra*, 49 Cal.App.5th at p. 206; accord, *In re D.B.*, at pp. 328-329.)

 2. *Substantial evidence supports the jurisdiction findings under section 300, subdivision (b)(1)*

Father contends there was not substantial evidence to support the juvenile court's jurisdiction findings under section 300, subdivision (b)(1), based on his inappropriate plan of leaving

15

Paul in Mother's care. He argues that by the time of the jurisdiction hearing, there was no reasonable likelihood Father would leave Paul in Mother's or Gwendolyn's care because Paul could live with Father in Kentucky with Mother living in California.

Substantial evidence supports the jurisdiction findings. Father acknowledged that starting in August 2019 Paul lived with Mother and Father in Gwendolyn's home notwithstanding the September 27, 2017 final juvenile custody order that granted Mother only monitored visitation. Father claimed that when he moved to Kentucky in October 2019, he left Paul in Gwendolyn's care, not Mother's. But Father knew Mother lived in the house. Although Father claimed he did not recall Mother's visits were only to be monitored, the same final custody order that granted him sole legal and physical custody limited Mother to monitored visitation. By leaving Paul with Gwendolyn and Mother, Father allowed Mother to have unmonitored access to Paul.

Further, Father lacked insight into the risk of harm Mother posed to three-year-old Paul. Father repeatedly stated he trusted Mother and had no concerns about Paul being in her care. And Father denied knowledge of Mother's substance abuse history, but Paul tested positive for opiates and benzodiazepine at birth and was a prior dependent of the court because of Mother's substance abuse and Father's failure to protect him. It was Mother's opiate use, her failure to complete a substance abuse program, and her continued positive drug tests that led to the final order requiring monitored visitation. In addition, although Father denied he was aware that Mother had ever physically abused Lacazia, he and Mother were in a relationship in 2014

16

when Lacazia and Malachi were detained in part because of Mother's physical abuse of Lacazia.

Finally, although Mother and Father claimed they would continue to live apart, they were in a relationship and considered themselves common law husband and wife. And Mother told the dependency investigator she planned to get Paul and Malachi back and "they are coming home." Given Mother and Father's ongoing relationship and their failure to abide by the existing custody order, Paul was at substantial risk of harm from Father again allowing Mother to have unmonitored visits (whether in California or Kentucky) absent the juvenile court's supervision.[8]

---

[8] Because we affirm the jurisdiction findings under section 300, subdivision (b)(1), based on Father's inappropriate plan of leaving Paul in Mother's care, we do not reach whether substantial evidence supports the jurisdiction findings based on Mother's physical abuse of Lacazia and her failure to protect Lacazia from the maternal relatives' physical abuse under section 300, subdivision (j). "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J., supra*, 56 Cal.4th at p. 773; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 896; *In re Briana V.* (2015) 236 Cal.App.4th 297, 309-310.)

17

B.    *Substantial Evidence Does Not Support Removal of Paul from Father*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 264-265; see § 361, subd. (d).)  The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention."  (*In re D.B., supra*, 26 Cal.App.5th at p. 332; accord, *In re N.M.* (2011) 197 Cal.App.4th 159, 170.)  "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.]  'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.'" (*N.M.*, at pp. 169-170; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate

court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; accord, *In re V.L., supra*, 54 Cal.App.5th at p. 155 ["*O.B.* is controlling in dependency cases."].)  We review the entire record to determine whether the removal order is supported by substantial evidence.  (*V.L.*, at p. 155; *In re D.B., supra*, 26 Cal.App.5th at p. 328; see *Conservatorship of O.B.*, at p. 1011.)

The juvenile court based its removal order on the same facts that supported its jurisdiction findings—that Mother failed to address the risk posed by her physical abuse of Lacazia and Father left Paul with Mother knowing of Mother's prior substance abuse and physical abuse.  But the court failed to consider whether there were reasonable means to protect Paul's physical and emotional health that were less drastic than removing him from Father's custody.  (§ 361, subd. (d); see *In re D.P., supra*, 44 Cal.App.5th at p. 1069 [remand was necessary for juvenile court to consider reasonable means to protect child without removal from mother where child lived with father and restraining order protected child from mother]; *In re Ashly F.* (2014) 225 Cal.App.4th 803, 810 [remand was necessary for juvenile court to make findings as to whether there were reasonable means to protect children other than removing them from mother, including unannounced visits by Department,

19

public health nursing services, in-home counseling services, and removing mother from the home]; see also § 361, subd. (e) ["The court shall state the facts on which the decision to remove the minor is based."].)

Had the Department evaluated and the court considered whether there were reasonable means to protect Paul, there is a reasonable probability the court would have concluded removal of Paul from Father was not supported by clear and convincing evidence. (*In re D.P., supra*, 44 Cal.App.5th at p. 1070 [juvenile court's error in not considering alternatives to removal was not harmless]; *In re Ashly F., supra*, 225 Cal.App.4th at p. 811 [removal of child from home in light of evidence of reasonable means to protect child without removal was prejudicial error].) Although Father showed poor judgment and lack of insight by leaving Paul with Mother despite her substance abuse issues and prior physical abuse of Lacazia, and he violated the juvenile custody order requiring Mother's visitation be monitored, there is no evidence there would be a substantial danger to Paul if he lived with Father in Kentucky and Mother remained in California. According to the jurisdiction and disposition report, Father had "frequent, consistent, and quality virtual visits" with Paul; he had successfully reunified with Paul after the prior dependency case; he had stable housing in Kentucky and the support of the paternal grandmother; he had cooperated with the Department; and the multidisciplinary assessment team report found Father was "outgoing, loving, talkative, expressive, focused, smart, and resilient."

Although the dependency investigator was unable to assess the bedrooms of the paternal grandmother and paternal uncle where Father was living, the court could have continued the

disposition hearing to allow the dependency investigator to complete an assessment of Father's home in Kentucky. To the extent the juvenile court was concerned that Mother would travel to Kentucky to be with Paul or Father would bring Paul back to California, the court (and the Department) had an obligation to evaluate reasonable means to ensure this did not occur and Paul stayed safe. For example, the court could have required Father and Paul to have weekly videoconferences with the social worker to ensure they continued to live in Father's home in Kentucky. The Department could likewise have conducted unannounced visits to Gwendolyn's house to confirm Mother continued to live there, and Paul did not.

We therefore reverse the disposition order and remand for a new disposition hearing at which the juvenile court shall determine based on facts existing at the time of the hearing whether there are reasonable means to protect Paul's physical and emotional health without removing him from Father's custody.[9]

---

[9] Father also challenges the order appointing Paul's caregiver as the coeducational rights holder for Paul. Father has forfeited his claim of error because his counsel informed the juvenile court at the disposition hearing that Father had no objection to the order. (*In re S.B.* (2004) 32 Cal.4th 1287,1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"]; *In re J.W.* (2020) 53 Cal.App.5th 347, 357 ["the only rules not subject to forfeiture are those conferring fundamental jurisdiction"]; *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1346 ["A claim of error is forfeited on appeal if it is not raised in the trial court."].) However, if the juvenile court on remand

## DISPOSITION

The jurisdiction findings are affirmed.  The disposition order is reversed, and the matter is remanded for further proceedings consistent with this opinion.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

determines removal is not necessary, it should address its order granting coeducational rights to the current caregiver.